UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JEREMY BERGQUIST,

        Petitioner,                                   Hon. Janet T. Neff

v.                                          Case No. 1:10-CV-638

MARY BERGHUIS,

        Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on Bergquist's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Bergquist's petition be **denied**.


**BACKGROUND**

        As a result of events which occurred on April 19, 2008, Petitioner was charged with armed robbery and first degree home invasion. (Plea Transcript, August 14, 2008, 5-6). Petitioner was also charged with being an habitual felon. (Tr. 6-7). Pursuant to a plea agreement, Petitioner agreed to plead guilty to these charges. (Tr. 3-5). In return, the prosecution agreed not to charge Petitioner with possessing a firearm during the commission of a felony. (Tr. 3-5). The prosecution also agreed to the imposition of a sentence calculated without consideration of the habitual felon

1

conviction and, furthermore, agreed that Petitioner's minimum sentence would not exceed 135 months. (Tr. 3-13). The prosecution and trial judge agreed that Petitioner's sentences would be served concurrently, not consecutively.[1] (Tr. 3-5, 13). Finally, the trial judge agreed that he would not sentence Petitioner to the maximum sentence, life in prison, for armed robbery. (Tr. 9).

Petitioner was sentenced to serve concurrent sentences of 124-300 months on the armed robbery conviction and 96-300 months on the home invasion conviction. (Sentencing Transcript, September 15, 2008, 11). For reasons detailed below, Petitioner's sentence on the home invasion conviction was later reduced to 96-240 months. (Dkt. #2 at 85 of 353). Asserting the following claims, Petitioner later moved in the Michigan Court of Appeals for leave to appeal his sentence:

I. Whether it was constitutional error to assess 25 points for PRV 1 for the charges dismissed pursuant to the Holmes Youthful Trainee statute because assessment of those points in this case is a violation of the constitutional protections against punishment from ex-post facto laws.

II. Whether it was legal error and an abuse of discretion to assess 15 points for OV 15 for predatory conduct, whether it was waived because of no objection by the defense attorney, and whether this error is a violation of the Sixth Amendment because it was caused by ineffective counsel at sentencing.

III. Whether it was error to assess 10 points for OV 14 for being the leader, whether it was waived because of no objection by the defense attorney, whether an evidentiary hearing was required on this issue, and whether this error is a violation of the Sixth

----

[1] Under Michigan law, the trial court can order that a sentence for first degree home invasion "be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." Mich. Comp. Laws § 750.110a(8).

Amendment because it was caused by ineffective counsel at sentencing.

IV. Whether it was legal and constitutional error (a violation of due process) and an abuse of discretion for the trial judge to deny Defendant's motion to set aside the guilty plea without holding an evidentiary hearing, whether the guilty plea was constitutionally defective because the factual basis for the charge was not established (the plea did not include facts to establish that the defendant, as an aider and abetter, had the same intent as the principal or knew the intent of the principals at the time of giving the aid) and whether the plea was not understanding, voluntary, or accurate in violation of state law and the Fourteenth Amendment of the United States Constitution.

V. Whether the guilty plea was constitutionally defective because of ineffective trial counsel. Were the sentencing errors caused by ineffective trial counsel. Was it an abuse of discretion to not hold an evidentiary Ginther hearing. Did these errors deprive the defendant of his Sixth Amendment right to counsel.

The Michigan Court of Appeals denied Petitioner's motion for leave to appeal for lack of merit in the grounds presented. *People v. Bergquist*, No. 293683, Order (Mich. Ct. App., Oct. 15, 2009). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Bergquist,* No. 140131, Order (Mich., Feb. 26, 2010). Petitioner initiated the present action on July 2, 2010, asserting the same five issues identified above.

**STANDARD OF REVIEW**

Bergquist's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause

of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the

5

merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo.

6

*See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.         **Ex Post Facto Claim  (Habeas Claim I)**

      In 1996, long before the events giving rise to the present action, Petitioner was convicted of home invasion.  As part of the adjudication of this offense, Petitioner was permitted to participate in the Holmes Youthful Trainee Act (HYTA), a program which permitted offenders between the ages of 17-21 to avoid conviction for certain offenses by successfully completing a term of probation.  *See* Mich. Comp. Laws. § 762.11; *People v. Bobek*, 553 N.W.2d 18, 20-21 (Mich. Ct. App. 1996) ("[o]nce compliance is achieved, a youthful trainee will not be deemed convicted of a crime").  Petitioner successfully participated in the HYTA and was discharged from probation on October 13, 1997.  (Dkt. #2 at 119 of 353).  Due to an unspecified administrative oversight, however, Petitioner's 1996 conviction for home invasion was never expunged.

      As of the date Petitioner committed the 1996 home invasion, as well as the date on which he completed his term of probation under the HYTA, Michigan law held that "[a]n assignment to youthful trainee status under the [H]YTA is not to be construed as a conviction" when calculating a defendant's sentencing guidelines score.  *See People v. Garner*, 544 N.W.2d 478, 479 (Mich. Ct. App. 1996).  In 1998, however, Michigan law was amended to provide that successful participation in the HYTA was to be counted as a prior conviction when calculating a defendant's sentencing

guidelines score. *See People v. Allen*, 2012 WL 5235944 at *6-7 (Mich. Ct. App., Oct. 23, 2012). When Petitioner was sentenced for the crimes presently at issue, committed in 2008, his 1996 conviction for home invasion was specifically considered as a prior conviction in the calculation of his sentencing guideline score. (Dkt. #2 at 106 of 353). Petitioner asserts that use of his 1996 conviction in this manner violated the Constitution's prohibition against ex post facto laws.

The *Ex Post Facto* clause provides that "no State shall. . .pass any. . .ex post facto Law." U.S. Const. art. I, § 10, cl. 1. This provision embodies a "presumption against the retroactive application of new laws" and is "an essential thread in the mantle of protection that the law affords the individual citizen." *Lynce v. Mathis*, 519 U.S. 433, 439 (1997). The *Ex Post Facto* Clause has been interpreted as prohibiting the enactment of any law that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Ruhlman v. Brunsman*, 664 F.3d 615, 619 (6th Cir. 2011) (quoting *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001)). However, the *Ex Post Facto* Clause does not prohibit legislative changes that merely result in "some ambiguous sort of 'disadvantage,'" but instead only prohibits retroactively applied changes that "alter[] the definition of criminal conduct or increase[] the penalty by which the crime is punishable." *Doe v. Bredesen*, 507 F.3d 998, 1003 (6th Cir. 2007) (citation omitted). Accordingly, "[t]o fall within the *ex post facto* prohibition, a law must be retrospective - that is, 'it must apply to events occurring before its enactment' - and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment for the crime.'" *Lynce v. Mathis*, 519 U.S. at 441.

Issues implicating the *Ex Post Facto* Clause can certainly arise in the criminal sentencing context. For example, the Supreme Court has long held that where the punishment for

a criminal act is enhanced or increased after an individual commits such act, the individual cannot be sentenced *for that particular criminal act* under the subsequent, more severe, provision. *See, e.g., Lindsey v. Washington*, 301 U.S. 397, 400-01 (1937) (observing that the *Ex Post Facto* Clause "forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer"); *Miller v. Florida*, 482 U.S. 423, 425-34 (1987) (changes to the sentencing guidelines formula, enacted after the commission of the offense in question but before sentencing for such, invalid under the *Ex Post Facto* Clause). Likewise, the application of post-sentencing changes to the formula for calculating a prisoner's "gain time" credits violates the *Ex Post Facto* Clause. *See Weaver v. Graham*, 450 U.S. 24, 25-27 (1981).

The *Ex Post Facto* Clause is not violated, however, where the challenged enactment increases the punishment (or potential punishment) for future criminal acts based upon a recharacterization of crimes committed before enactment of the challenged provision. For example, in *Gryger v. Burke*, 334 U.S. 728 (1948), Gryger was sentenced to life in prison pursuant to the Pennsylvania Habitual Criminal Act. *Id.* at 729. Gryger argued that because one of the prior crimes that formed the basis for the finding that he was an "habitual criminal" was committed before the passage of the Pennsylvania Habitual Criminal Act, his sentence violated the *Ex Post Facto* Clause. The Court disagreed, concluding as follows:

> Nor do we think the fact that one of the convictions that entered into the calculations by which petitioner became a fourth offender occurred before the Act was passed, makes the Act invalidly retroactive or subjects the petitioner to double jeopardy. The sentence as a fourth offender or habitual criminal is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.

*Id.* at 732.

The Supreme Court recently reiterated this principle in *United States v. Rodriquez*, 553 U.S. 377 (2008). Gino Rodriquez was convicted in federal court of possession of a firearm by a convicted felon. *Id.* at 380. The United States moved to have Rodriquez sentenced under the Armed Career Criminal Act (ACCA), which provided for a 15 year minimum sentence for this particular offense if the defendant also had three previous convictions "for a violent felony or a serious drug offense, or both." *Rodriquez*, 553 U.S. at 380-81. The ACCA defined a "serious drug offense" as one for which a "maximum term of imprisonment of ten years or more is prescribed by law." *Id.* at 380.

Rodriquez had previously been convicted of five felonies, burglary on two occasions as well as three drug-related offenses all of which were committed in Washington. *Rodriquez*, 553 U.S. at 380. The district court agreed that the prior burglary convictions constituted violent felonies for purposes of the ACCA, but concluded that Rodriquez's drug offenses did not qualify as "serious drug offenses" because the maximum sentences for each were less than ten years in prison. *Id.* at 380-82. At the time Rodriquez committed the three drug-related offenses, the Washington statute that Rodriquez was convicted of violating provided for imprisonment "for not more than five years," but a related provision further provided that "[a]ny person convicted of a second or subsequent offense" could "be imprisoned for a term up to twice the term otherwise authorized." *Rodriquez*, 553 U.S. at 381 (internal citations omitted).

The United States argued that in light of these provisions, the latter two of Rodriquez's drug-related convictions, because they subjected Rodriquez to a "maximum term of imprisonment of ten years or more," constituted serious drug offenses under the ACCA. *Id.* The

district court disagreed, concluding that Rodriquez's "drug-trafficking convictions were not convictions for "serious drug offense[s]" under ACCA because the "maximum term of imprisonment" for the purposes of [the ACCA] is determined without reference to recidivist enhancements." *Rodriquez*, 553 U.S. at 382. The Ninth Circuit affirmed this determination. *Id.*

The Supreme Court rejected the lower courts' analysis, finding that such "contorts [the] ACCA's plain terms" and "is also inconsistent with the way in which the concept of the 'maximum term of imprisonment' is customarily understood." *Rodriquez*, 553 U.S. at 382-84. The Court also rejected the argument that "a defendant's status as a recidivist has no connection to whether the offense committed by the defendant was a serious one." *Id.* at 385. Specifically, the Court observed:

> If respondent were correct that a defendant's record of prior convictions has no bearing on the seriousness of an offense, then it would follow that any increased punishment imposed under a recidivist provision would not be based on the offense of conviction but on something else - presumably the defendant's prior crimes or the defendant's "status as a recidivist." But we have squarely rejected this understanding of recidivism statutes. In *Nichols v. United States,* we explained that "'[t]his Court consistently has sustained repeat-offender laws as penalizing only the last offense committed by the defendant.'" When a defendant is given a higher sentence under a recidivism statute - or for that matter, when a sentencing judge, under a guidelines regime or a discretionary sentencing system, increases a sentence based on the defendant's criminal history - 100% of the punishment is for the offense of conviction. None is for the prior convictions or the defendant's "status as a recidivist." The sentence "is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because [it is] a repetitive one."

*Rodriquez*, 553 U.S. at 385-86 (internal citations omitted).

In 1998, ten years before Petitioner committed the offenses for which he is presently

incarcerated, Michigan law was amended to provide that successful participation in the HYTA was to be counted as a prior conviction when calculating a defendant's sentencing guidelines score. This particular change in the law is akin to the enactment of a recidivist statute. This change neither altered the definition of Petitioner's 1996 conduct, nor increased the penalty Petitioner incurred for his 1996 home invasion conviction. In sum, as the Supreme Court has clearly held for more than sixty years, the change in the law of which Petitioner complains did not violate his right to not be subjected to unconstitutional ex post facto laws.

Petitioner's ex post facto claim was rejected by the Michigan courts. This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

**II.      Guilty Plea  (Habeas Claim IV)**

Petitioner asserts that he is entitled to relief because his guilty plea was not voluntary, knowing, and intelligent. Petitioner further asserts that relief is appropriate because a factual basis for his guilty pleas was not established by the trial court.

Plaintiff's claim that he is entitled to relief because the record allegedly does not contain an adequate factual basis to sustain the convictions in question is without merit because "there is no constitutional requirement that a trial judge inquire into the factual basis of a plea." *Bonior v. Conerly*, 416 Fed. Appx. 475, 478 (6th Cir., Nov. 17, 2010) (quoting *Roddy v. Black*, 516 F.2d 1380 (6th Cir. 1975)); *see also*, *Hann v. Caruso*, 2012 WL 2564818 at *7 (E.D. Mich., July 2,

2012) (same). So long as a guilty plea "is intelligently and voluntarily entered, the federal constitution does not mandate that a factual basis supporting a guilty plea be established, or even that the defendant admit factual guilt." *Hann*, 2012 WL 2564818 at *7. The Court, therefore, will undertake to review whether Petitioner's guilty plea satisfied the Constitution's requirements.

A guilty plea is more than an admission that the accused performed certain acts, but is instead "a conviction." *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). Following a guilty plea "nothing remains but to give judgment and determine punishment." *Id.* By pleading guilty a criminal defendant surrenders several important constitutional rights, including (a) the privilege against compelled self-incrimination; (b) the right to trial by jury; and (c) the right to confront one's accusers. *Id.* at 243. To ensure that a criminal defendant is not improperly deprived of these (and other) rights, to be valid a guilty plea must be made "voluntarily, knowingly, and intelligently" with "sufficient awareness of the relevant circumstances and likely consequences." *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005).

The *Boykin* Court identified certain rights (identified immediately above) which a criminal defendant waives by pleading guilty. While the *Boykin* Court made clear that waiver of these (and other) rights cannot be assumed, the Court did not hold that a guilty plea is valid only where a criminal defendant was first notified as to each and every right he would be waiving by pleading guilty. *Boykin*, 395 U.S. at 243-44. In fact, less than one year after its *Boykin* decision the Supreme Court, in *Brady v. United States*, 397 U.S. 742 (1970), upheld the validity of a guilty plea even though the defendant had not been specifically advised of the rights identified by the *Boykin* Court. *Id.* at 743-58. With respect to its *Boykin* decision, the Court clarified its significance stating that "[t]he new element added in *Boykin* was the requirement that the record must affirmatively

disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily." *Id.* at 747 n.4.

Accordingly, as other courts have since recognized, neither *Boykin* nor any other Supreme Court authority requires that a criminal defendant be specifically advised of any particular rights before his guilty plea can be deemed constitutionally valid. *See, e.g., Threadgill v. Galaza*, 2006 WL 2084165 at *3 (E.D. Cal., July 25, 2006) ("specific articulation of the *Boykin* rights is not the sine qua non of a valid guilty plea;" if the "record demonstrates that a guilty plea is knowing and voluntary, no particular ritual or showing on the record is required"); *United States v. Toles*, 1992 WL 129284 at *3 (9th Cir., June 4, 1992) ("*Boykin* does not require that the trial judge specifically list each right waived by a defendant who pleads guilty"); *Carter v. Brooks*, 2001 WL 169584 at *6-7 (D. Conn., Feb. 13, 2001) (the Supreme Court has "in no way intimated the precise terms of the inquiry that the trial judge should make of a defendant before accepting his plea" and "a guilty plea will not be invalidated simply because of the district court's failure. . .to enumerate one or more of the rights waived by the defendant as the result of such a plea"); *United States v. Smith*, 1990 WL 92601 at *2 (9th Cir., July 5, 1990) (the standard is not whether the trial judge specifically articulated certain rights, but whether "the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant").

Accordingly, the relevant question presented by Petitioner's claim is not whether the trial judge specifically articulated or identified for Petitioner a list of the various rights he would be surrendering by pleading guilty. Rather, as noted above, the question is whether Petitioner's decision to plead guilty was made "voluntarily, knowingly, and intelligently" with "sufficient awareness of the relevant circumstances and likely consequences." The plea must represent "a voluntary and

intelligent choice among the alternative courses of action open to the defendant." *Wilkerson v. Jones*, 109 Fed. Appx. 22, 23 (6th Cir., Aug. 6, 2004) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Determining whether a guilty plea satisfies this standard requires "an evaluation of all the relevant circumstances surrounding the plea." *King v. Dutton*, 17 F.3d 151, 153 (6th Cir. 1994).

At the plea hearing, the trial judge questioned Petitioner at length regarding his decision to plead guilty. (Plea Hearing, August 14, 2008, 7-22). During this exchange, Petitioner acknowledged that he understood the charges he faced and the potential penalties for each. (Tr. 7-10). The trial judge explained to Petitioner that his sentences would be served concurrently and that his minimum sentence would not exceed 135 months. (Tr. 9-15). Petitioner indicated that he understood the commitments the trial judge was making with respect to his sentence. (Tr. 14-15). Petitioner acknowledged that he understood what it meant to "waive or give up a constitutional right." (Tr. 15-16). Petitioner stated that his decision to plead guilty was voluntary, he had not been subjected to threats to secure his guilty pleas, and he had not been promised anything other than what had been stated on the record. (Tr. 17). Petitioner acknowledged receiving and studying an advice of rights form. (Tr. 17). Petitioner acknowledged that he understood the rights he was surrendering by pleading guilty. (Tr. 17-18). Finally, Petitioner admitted the factual basis for the charges against him. (Tr. 18-21).

Considering the totality of the circumstances, Petitioner's claim that his guilty plea was not offered voluntarily, knowingly, and intelligently is without merit. This claim was rejected by the Michigan courts. This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an

unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

## III.            Denial of Ginther Hearing  (Habeas Claim V)

Petitioner asserts that he is entitled to habeas relief because his request for a *Ginther* hearing[2] was denied by the trial court. Whether Petitioner was entitled to a *Ginther* hearing is a matter of state law. *See Ezell v. Cason*, 2007 WL 518853 at *7 (W.D. Mich., Feb. 14, 2007). Habeas relief is not available, however, based on alleged violations of state law. *See* 28 U.S.C. § 2254. Likewise, Petitioner's right to due process was not violated by the denial of his request for a *Ginther* hearing because such did not deprive him of the ability or opportunity to assert his ineffective assistance of counsel claims in the state courts. *See Ezell*, 2007 WL 518853 at *8. Accordingly, this claim is rejected.

## IV.            Ineffective Assistance of Counsel  (Habeas Claims II, III and V)

Petitioner asserts several claims that the attorney who represented him in this matter, Eric Boeschenstein, provided constitutionally ineffective assistance. Specifically, Petitioner argues that Boeschenstein: (1) failed to object to the allegedly inaccurate scoring of his sentencing guidelines; (2) limited his representation of Petitioner to "pretrial resolution only;" (3) failed to discuss possible defenses with Petitioner; (4) failed to correct the clerical error that resulted in Petitioner's 1996 home invasion conviction not being expunged; and (5) failed to predict that the

---

[2]   Hearings at which evidence is presented regarding claims of ineffective assistance of counsel are, in Michigan, referred to as *Ginther* hearings. *See People v. Ginther*, 390 Mich. 436 (1973).

trial judge would impose an allegedly harsh sentence.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance

of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).

### A.     Scoring of the Sentencing Guidelines

Petitioner asserts that the trial judge erred in the scoring of certain offense variables when calculating his sentencing guidelines score. Specifically, Petitioner argues that the trial judge: (1) improperly scored offense variable 10 by assessing 15 points for engaging in predatory conduct, and (2) improperly scored offense variable 14 by assessing 10 points for being the leader of the group that committed the armed robbery in question. Petitioner asserts that his attorney's failure to object to the scoring of these two offense variables constituted ineffective assistance.

### 1.     Offense Variable 10

Under Michigan sentencing guidelines, offense variable 10 concerns "exploitation of a vulnerable victim." *People v. Cannon*, 749 N.W.2d 257, 260 (Mich. 2008). Scoring 15 points

for this particular offense variable is appropriate where the defendant engaged in "predatory conduct," defined as "preoffense conduct directed at a [vulnerable] victim for the primary purpose of victimization." *Id.* at 260-62. As the court made clear, assessment of 15 points for this offense variable is appropriate only where the defendant engaged in "preoffense" conduct that was "directed at a [vulnerable] victim." *Cannon*, 749 N.W.2d at 262. To illustrate the scope of this requirement, the court offered the following example:

> A lion that waits near a watering hole hoping that a herd of antelope will come to drink is not engaging in conduct directed at a victim. However, a lion that sees antelope, determines which is the weakest, and stalks it until the opportunity arises to attack it engages in conduct directed at a victim.

*Id.*

A review of the Presentence Investigation Report reveals that the assessment of 15 points for this offense variable was appropriate. (Dkt. #2 at 95-115 of 353). The robbery in question occurred at the residence of Edward Higgins and Robin Smith. (Dkt. #2 at 97-103 of 353). The couple operated a tow truck business out of their residence. (Dkt. #2 at 97-103 of 353). Prior to committing the armed robbery, Petitioner placed a fake request for tow truck service, thereby luring Higgins away from the residence and leaving Smith alone. (Dkt. #2 at 97-103 of 353). After Higgins departed on his fool's errand, Petitioner's two accomplices, Julius Foreman and Marcus Jackson, entered the residence, victimized Smith and committed armed robbery. (Dkt. #2 at 97-103 of 353). At his plea hearing, Petitioner testified under oath that he placed the telephone call to lure Ed Higgins away from the residence. (Plea Transcript, August 14, 2008, 20-21).

The example offered by the Michigan Supreme Court is quite apt, as Petitioner's behavior was no different than a lion engaging in "preoffense" conduct designed to isolate the

weakest member of the antelope herd prior to commencing an attack. Petitioner's argument that this offense variable was incorrectly scored is unpersuasive. As Michigan courts have held, sentencing guideline scoring decisions "for which there is *any* evidence in support will be upheld." *People v. James*, 705 N.W.2d 724, 727 (Mich. Ct. App. 2005). Thus, Petitioner cannot establish that his counsel's failure to object to the scoring of this offense variable constituted deficient performance.

2.       Offense Variable 14

Under Michigan sentencing guidelines, offense variable 14 addresses "the offender's role" in the subject activity. *People v. Stewart*, 2006 WL 2033987 at *3 (Mich. Ct. App., July 20, 2006). An assessment of 10 points under this offense variable is appropriate where "the offender was a leader in a multiple offender situation." Moreover, when assessing this offense variable, "the entire criminal transaction should be considered." *Id.*

Again, a review of the Presentence Investigation Report reveals that the assessment of 10 points for this offense variable was appropriate. (Dkt. #2 at 95-115 of 353). Petitioner acknowledged to the police that he used to work for Edward Higgins, but that Higgins had recently fired him for participating in an illegal "chop shop." (Dkt. #2 at 101 of 353). Robin Smith told police that the burglars, in addition to rummaging through the residence, also told Smith to "get into the safe" that was located in the bedroom closet. (Dkt. #2 at 99-102 of 353). Smith told police that employees or former employees would have known that Higgins maintained a safe in their bedroom. (Dkt. #2 at 100 of 353). Smith told police that "only employees or former employees" of their towing business would have known to enter their home by "jumping the fence and going through the storage lot." (Dkt. #2 at 100 of 353). Smith also informed the police that employees or former

employees would have known about the "unlocked slider" which Petitioner and his confederates used to gain access to the residence. (Dkt. #2 at 100 of 353).

Investigators learned from a confidential informant that Petitioner "had set up the robbery." (Dkt. #2 at 102 of 353). Julius Foreman, who participated in the armed robbery, informed police that the robbery was Petitioner's idea. (Dkt. #2 at 102 of 353). Foreman told police that Petitioner placed the telephone call to lure Ed Higgins away from the residence and that Petitioner instructed the group how to enter the residence. (Dkt. #2 at 102 of 353). The third participant in the robbery, Marcus Jackson, told police that Petitioner initiated the idea to commit the robbery because he was "mad at [Higgins] because he had been fired." (Dkt. #2 at 102 of 353). Jackson told police that Petitioner placed the telephone call to lure Ed Higgins away from the residence. (Dkt. #2 at 102-03 of 353). Jackson further informed police that when he and Foreman wavered in their commitment to go through with the robbery, Petitioner "began to call them names and urge them to go through with it." (Dkt. #2 at 103 of 353). At his plea hearing, Petitioner testified under oath that it was his idea to commit the robbery in question. (Plea Transcript, August 14, 2008, 19).

Again, Petitioner's argument that this offense variable was incorrectly scored is unpersuasive. Thus, Petitioner cannot establish that his counsel's failure to object to the scoring of this offense variable constituted deficient performance.


B.     Counsel's Limited Representation

Petitioner privately retained Boeschenstein to represent him in the trial court. (Dkt. #2 at 121 of 353). Petitioner and Boeschenstein entered into an agreement pursuant to which counsel limited his representation to pre-trial matters. (Dkt. #2 at 121 of 353). Petitioner argues that this

arrangement constituted ineffective assistance of counsel. As the trial judge noted, the arrangement between Petitioner and his attorney was neither inappropriate nor unethical. (Dkt. #2 at 80 of 353). The Court fails to discern how counsel's conduct of entering into an appropriate and ethical arrangement with his client constitutes deficient performance.

### C.      Failure to Discuss Possible Defenses

Petitioner asserts that his attorney rendered deficient performance by failing to discuss with him possible defenses to the crimes with which he was charged. Specifically, Petitioner asserts that Boeschenstein failed to explain to him that to be convicted on an aiding and abetting theory, he had to have possessed "the same intent as the principal."

As of April 19, 2008, Michigan law provided that to be convicted of armed robbery it must be proven that the defendant: (1) in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear; and (2) in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. *See People v. Bowman*, 2008 WL 1765248 at *1 (Mich. Ct. App., Apr. 17, 2008). To be convicted of armed robbery on an aiding and abetting theory, the prosecution must establish: (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time the defendant gave aid and

encouragement.  *See People v. Moore*, 2008 WL 183313 at *1 (Mich. Ct. App., Jan. 22, 2008).  To convict on an aiding and abetting theory, it must be proven that the aider and abetter possessed "the same intent necessary to convict the principal of the underlying crime."  *People v. Joseph*, 2008 WL 867984 at *2 (Mich. Ct. App., Apr. 1, 2008).

In support of this particular claim, Petitioner has submitted an affidavit he executed long after pleading guilty and being sentenced in this matter.  (Dkt. #2 at 146-52 of 353).  In his affidavit, Petitioner asserts the following:

> I was never told that as the driver of the car I was only guilty if I had the same intent as the co-defendants.  If my lawyer had told me that, I believe that I would have told him that no armed robbery was planned, that I did not participate in the planning of any armed robbery, and that I did not see a gun that night until after Marcus and Julius had gone up the fence and came back.  However, I know that my lawyer was not at fault for not putting in the duress defense because I was too afraid to tell anyone about that.  I did not tell my lawyer, my father, or my wife until after I was sentenced and my wife was moved to a secret location.

(Dkt. #2 at 151 of 353).

In short, Petitioner asserts that while he may have participated in a robbery, he did not intend to participate in an *armed* robbery because he was unaware, until after the crime had been committed, that one of his confederates was carrying a weapon at the time.  The record contains an affidavit executed by Boeschenstein in which he asserts that Petitioner did, in fact, believe that Marcus Jackson was carrying a firearm when he participated in the armed robbery in question.  (Dkt. #2 at 123 of 353).  Furthermore, Petitioner's affidavit completely contradicts the sworn testimony he provided at his plea hearing.  (Plea Hearing, August 14, 2008, 18-21).  Such a "self-serving affidavit carries little weight" in a habeas action, "especially in light of the copious evidence in the

record to contradict it." *Hoffner v. Bradshaw*, 622 F.3d 487, 500 (6th Cir. 2010).

Petitioner has not established that his attorney failed to discuss with him possible defenses to the crimes in question. Moreover, even if such were the case, Petitioner cannot demonstrate that he was prejudiced by such failure because Petitioner cannot demonstrate that there existed any defenses to the crimes with which he was charged.

D.      Failure to Correct the 1997 Clerical Error

As previously discussed, as part of his 1996 conviction for home invasion Petitioner was permitted to participate in a youthful offender program which, if successfully completed, would have resulted in the expungement of that particular conviction. Petitioner successfully completed the program in 1997, but due to an unspecified clerical error, Petitioner's home invasion conviction was not expunged. Petitioner argues that Eric Boeschenstein, who represented him in connection with the crimes for which he is presently incarcerated, rendered ineffective assistance by failing to correct the 1997 clerical error.

As noted above, in addition to being charged with armed robbery and home invasion stemming from the events of April 19, 2008, Petitioner was also charged with being an habitual offender. The habitual offender charge was based on Petitioner's 1996 home invasion conviction. As part of the plea agreement in this matter, Petitioner agreed to plead guilty to being a repeat offender, but the prosecution agreed to the imposition of a sentence calculated without consideration of the habitual felon conviction.

It does not appear, however, that the trial judge agreed to be bound by this particular part of the agreement between Petitioner and the prosecutor. A first offense conviction for first

degree home invasion was punishable by up to 20 years in prison. Mich. Comp. Laws § 750.110a(5). However, a person, with one prior felony conviction, convicted of first degree home invasion could be sentenced to up to 30 years in prison. *See* Mich. Comp. Laws § 769.10. As previously noted, the trial judge sentenced Petitioner to serve 96 months to 25 years in prison on the home invasion conviction. Thus, it does not appear that the trial judge agreed to be bound by the agreement to disregard Petitioner's prior home invasion conviction when imposing sentence. The trial judge's apparent failure to be bound by this part of the plea bargain agreement did not impact Petitioner's sentence for armed robbery as such is punishable, even for a first offense, by up to life in prison. *See* Mich. Comp. Laws § 750.89.

Petitioner faults his attorney for failing to correct the clerical error that prevented his 1996 home invasion conviction from being expunged in 1997 when he completed the youthful offender program. Petitioner asserts that if counsel had accomplished this task he could not have been convicted of being an habitual felon and, by extension, would have received a lesser sentence on his subsequent home invasion conviction. Even if counsel's failure in this regard were deficient, Petitioner cannot demonstrate that he was prejudiced by such.

In his post-conviction motion for relief from judgment filed in the trial court, Petitioner raised this particular claim of ineffective assistance of counsel. In response, the trial judge entered an Amended Judgment of Sentence which removed the habitual offender designation from Petitioner's record. (Dkt. #2 at 83-86 of 353). The trial judge also reduced the maximum portion of Petitioner's sentence for home invasion to reflect that the habitual felon designation had been eliminated. (Dkt. #2 at 83-86 of 353). The trial judge further ordered the Michigan Department of Corrections "to purge any of its entries" which reflected that Petitioner was a repeat offender. (Dkt.

#2 at 83-86 of 353). After taking these various actions, the trial judge denied Petitioner's ineffective assistance of counsel claim on the ground that Petitioner had not been prejudiced by counsel's alleged shortcoming. Petitioner nevertheless asserts that he was prejudiced by his attorney's failure to correct the aforementioned clerical error because it resulted in his sentencing guideline score being enhanced by the consideration of his 1996 conviction. As discussed above, however, use of Petitioner's 1996 conviction for this purpose was proper.

### E.    Failure to Predict the Sentence Imposed

As previously discussed, at his plea hearing Petitioner obtained several concessions from the prosecutor and the trial judge. Specifically, Petitioner's counsel secured for Petitioner the following benefits: (1) an agreement not to charge Petitioner with possessing a firearm during the commission of a felony, the sentence for which would have to be served consecutively to any other sentences; (2) an agreement that Petitioner's minimum sentence would not exceed 135 months; (3) an agreement that Petitioner's sentences for armed robbery and home invasion would be served concurrently, not consecutively; and (4) a concession from the trial judge that Petitioner would not be sentenced to life in prison for armed robbery. Despite the significant benefits regarding sentencing that counsel secured, Petitioner nevertheless asserts that his attorney rendered ineffective assistance because he failed to predict that the trial judge would impose an allegedly harsh sentence. Specifically, Petitioner asserts that once his attorney realized that the trial judge "refused to do a *Cobbs* Committment"[3] counsel's advice that the judge would likely impose a sentence at "the lower

---

[3] In *People v. Cobbs*, 505 N.W.2d 208 (Mich. 1993), the Michigan Supreme Court authorized a particular type of plea agreement in which the trial judge indicates (as part of the plea agreement) a proposed sentence; while the judge is not bound to impose this particular sentence, if he fails to do so the defendant retains the absolute right to withdraw his

end of the guidelines" was irresponsible and ineffective counsel. Petitioner further asserts that "if the judge had leniency in mind, he would have given a Cobbs Commitment."

Petitioner's argument fails for several reasons. First, it is premised upon two assumptions, neither of which has been established. Petitioner asserts that the trial judge "refused" to enter into a *Cobbs* agreement. This is contradicted by the trial judge's statement at the plea hearing that there was a *Cobbs* agreement in place. (Plea Hearing, August 14, 2008, 14). It is further contradicted by Eric Boeschenstein's affidavit. (Dkt. #2 at 122-24 of 353). Petitioner further asserts that Boeschenstein advised him "that the judge would likely sentence [him] at the low end of the [sentencing] range." Again, this is contradicted by counsel's affidavit. (Dkt. #2 at 122-24 of 353).

The more fundamental problem with Petitioner's argument is that he is faulting his attorney for, in essence, lacking the ability to predict the sentence that the trial judge would ultimately impose. The Court is aware of no authority that such inability constitutes deficient performance. Moreover, even if such were the case, Petitioner's claim fails because he cannot establish that he was prejudiced by Boeschenstein's performance. As previously noted, prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." In this particular context, Petitioner must show that absent counsel's alleged errors he would have received a lesser sentence. *See, e.g., Lafler v. Cooper*, 132 S.Ct. 1376, 1386 (2012); *Wiggins v. Smith*, 539 U.S. 510, 534-36 (2003). Petitioner has made no such showing.

Petitioner's claims of ineffective assistance were rejected by the Michigan courts. These decisions were neither contrary to, nor involve an unreasonable application of, clearly

___

plea. *See Wright v. Lafler*, 2007 WL 2566042 at *1 (6th Cir., Sept. 5, 2007).

established federal law.  Furthermore, such were not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue on which habeas relief may be granted.

**V.          Sentencing Claims  (Habeas Claims II and III)**

Petitioner asserts that the trial judge incorrectly scored certain of the offense variables, thereby resulting in an inaccurate sentencing guidelines score.  Claims alleging error in the scoring of these offense variables, however, is a matter of Michigan law on which habeas relief cannot be predicated.  *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States"); *Coleman v. Curtin*, 425 Fed. Appx. 483, 484-85 (6th Cir., June 6, 2011) (claims that a state court improperly calculated the relevant offense variables is not cognizable in a federal habeas proceeding).  Accordingly, this claim is rejected.

**CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Bergquist's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file

objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  May 13, 2013

 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge